# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

CORRY L. GRABER,           )
                                     )

       Plaintiff,         )
                                     )

       v.                  )      No. 3:09 CV 299
                                     )

MAD BREWER, INC., d/b/a ANTHONY'S  )
OLD STATE ALE HOUSE,        )
                                     )

       Defendant.       )

## OPINION and ORDER

Defendant Mad Brewer, Inc. ("Mad Brewer") has moved for summary judgment (Def.'s Mot. for Summ. J., DE # 19; Def.'s Br. in Supp. of Mot. for Summ. J., DE # 20), plaintiff Corry L. Graber ("Graber") has filed a response in opposition (Pl.'s Resp. in Opp'n. to Summ. J., DE # 23), and Mad Brewer has filed a reply. (Def.'s Reply to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. 1, 5, DE # 24.) For the reasons explained below, the motion will be **granted.**

## I.    BACKGROUND

First, the court must resolve the parties' argument concerning what facts this court should consider in addressing the motion for summary judgment. In compliance with the Local Rules of the United States District Court for the Northern District of Indiana Rule 56.1,[1] Mad Brewer's brief in support of its motion for summary judgment included a statement of material facts with appropriate citations to

---

[1] Both the court and the parties cite to the version of Rule 56.1 that was in effect when the plaintiff filed her response.

affidavits and other admissible evidence. (Def.'s Br. 1-9.)[2] According to RULE 56.1,

Graber should have included a section in her response labeled "Statement of Genuine

Issues" that included "all material facts as to which it is contended there exists a

genuine issue which needs to be litigated" and made "appropriate citations to discovery

responses, affidavits, depositions, or other admissible evidence." LOCAL RULE OF THE

U.S. DIST. COURT FOR N.D. IND. RULE 56.1 (2009). In deciding the motion for summary

judgment, a court should "assume that the facts as claimed and supported by

admissible evidence by the moving party are admitted to exist without controversy"

unless the nonmoving party has controverted these facts, with support from discovery

materials, in the "Statement of Genuine Issues." *Id.*

Instead of adhering to RULE 56.1, Graber included a section labeled "Statement of

Material Facts in Dispute"(Pl.'s Resp. 1-2), which responds to Mad Brewer's statement

of the facts, but does not provide citations to any discovery materials and a "Statement

of the Facts: Summary of Facts and Response to Defendant's Facts" which provides

Graber's version of the facts and citations to discovery materials, but does not directly

address much of Mad Brewer's version of the facts. (*Id.* at 2-8.) In the first section,

Graber states "all issues of material facts are disputed." (*Id.* at 1.)

In its reply, Mad Brewer argues that there are no material facts in dispute

because Graber's "Statement of Material Facts in Dispute" does not state the facts she

---

[2] All citations are to the page numbers assigned to documents by the CM/ECF
system.

disputes and does not specifically cite to discovery materials. (Def.'s Reply 5.) Mad

Brewer points to twelve categories of facts that it argues the plaintiff has admitted are

undisputed by her failure to properly respond under RULE 56.1.

The court agrees with part of Mad Brewer's argument - Graber cannot establish

that facts are in dispute by simply stating that they are. Instead, she must point to

admissible pieces of discovery that place the defendant's version of the facts into

dispute. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008) (stating

that the non-moving party must identify "specific facts demonstrating that there is a

genuine issue for trial"); *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 563 (7th Cir. 2002)

("As we have stated over and over again, allegations of the mere existence of some

alleged factual dispute are not enough to preclude summary judgment.").

However, the court rejects the view that Graber has failed to place any of the

material facts listed by Mad Brewer into dispute. In coming to this conclusion Mad

Brewer appears to only consider Graber's complete lack of citations to pieces of

discovery in the section "Statement of Material Facts in Dispute." However, the section

of Graber's brief entitled "Statement of the Facts: Summary of Facts and Response to

Defendant's Facts" does make citations to a piece of discovery, namely Graber's

affidavit. Although Graber's labeling in her response is not technically correct, she has

still substantially complied with RULE 56.1, and it is clear that both portions of her brief

were intended to address the material facts she disputes. *Cohen v. Orthalliance New*

*Image*, 252 F. Supp. 2d 761, 764-65 (7th Cir. 2003). Therefore, the court will consider both sections as Graber's account of the facts in dispute.

When Graber has cited to a portion of the discovery materials to support her dispute, the court will consider those facts disputed. Graber's general assertions that facts are in dispute are not sufficient to put those facts into dispute. When Graber has either completely failed to respond to a discovery-supported assertion of fact or has not provided any discovery citations to refute the assertion, the court will make note of that and accept that Graber has admitted that this fact is not in dispute. LOCAL RULE OF THE U.S. DIST. COURT FOR N.D. IND. RULE 56.1 (2009).

Further, Graber has not contested the authenticity of any of the documents that Mad Brewer has offered in support of its motion for summary judgment. Therefore, the court accepts the authenticity of those documents for the purposes of this summary judgment motion and will consider the facts within them to be undisputed when Graber has not raised specific arguments supported by discovery to contest them. *See Metro. Life Ins. Co.*, 297 F.3d at 563.

Accordingly, the facts discussed herein are either undisputed, as explained above, or, when in dispute, resolved in favor of the non-moving party, Graber. *See Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). The court has included some facts as Mad Brewer sees them in order to explain the parties' dispute.

*A.*     *Parties*

Mad Brewer is a corporation and Eric Brewer is its sole shareholder[3] and

president. (Eric Brewer Aff. ¶ 4, Def.'s Exh. to Br. in Supp. of Def.'s Mot. for Summ. J.,

DE # 20-2.) In 2008, Mad Brewer negotiated and entered into a licensing agreement with

Mad Anthony's Brewing Company ("Mad Anthony's") to open a brew pub restaurant

in Elkhart, Indiana. (*Id.* ¶ 5.) Pursuant to the licensing agreement, Mad Brewer could

use the Mad Anthony's name, its line of beers, and its menu. (*Id.* ¶ 6.) The licensing

agreement mandated that Mad Brewer meet certain quality standards and offered Mad

Brewer the opportunity to utilize certain services offered by Mad Anthony's such as

accounting and payroll services. (*Id.*) Mad Anthony's was headquartered in Fort Wayne

and had two other locations in Warsaw and Auburn, Indiana. (*Id.* ¶ 2.) Mad Brewer was

opened to the public on December 16, 2008. (Eric Brewer Aff. ¶ 14.) Apart from her

assertions that Neels and Stucky were partners in Mad Brewer, Graber does not dispute

these facts.

---

[3] In her affidavit, Graber refers to Jeff Neels and Blaine Stucky as partners or co-owners of Mad Brewer. (Graber Aff. ¶¶ 13, 17.) Mad Brewer responds that they are not co-owners as Eric Brewer is the sole owner of Mad Brewer, but it does not clearly explain the roles that Neels and Stucky played. (Def.'s Reply 10.) Graber's affidavit is insufficient to put Mad Brewer's assertion that Eric Brewer was the only owner of Mad Brewer into dispute because, Graber, unlike Eric Brewer, does not show that she has personal knowledge of the ownership of Mad Brewer. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.,* 991 F.2d 1249, 1259 (7th Cir. 1993) ("Affidavits used to support a motion for summary judgment must be made on personal knowledge and set forth facts that would be admissible as evidence at trial. Fed.R.Civ.P. 56(e).").

Graber was the general manager for Mad Brewer from on or about July 31, 2008, to early January, 2009. (*Id.* ¶¶ 12, 22.)

B.      *Process of hiring a general manager for Mad Brewer*

Eric Brewer made all of the significant hiring decisions for Mad Brewer, including decisions regarding the employment of management staff. (*Id.* ¶ 4.) Eric Brewer began interviewing candidates for the position of general manager at Mad Brewer in May, 2008. (Eric Brewer Aff. ¶ 9.) The general manager's duties were to oversee Mad Brewer's day-to-day operations, manage personnel, keep financial records, manage and procure inventory and supplies, prepare and submit payroll, and calculate and reconcile cash and charge receipts on a daily basis. (*Id.*)

On July 1, 2008, Ed Tribble ("Tribble"), a male, was hired into the position. (*Id.*) After about four weeks, Tribble was fired for failure to adequately perform. (*Id.*) In late July, Eric Brewer hired Graber as general manager at an annual salary of $47,000 with an annual potential bonus of $5,000. (*Id.*) Mad Brewer's restaurant opened on December 16, 2008, with Graber as the general manager. (*Id.*)

As described further below, Brett Jones ("Jones"), the assistant manager[4] under Graber, was promoted to the role of general manager after Graber was terminated. (Eric

_____

[4] In her affidavit Graber refers to Jones as the "kitchen manager." (Graber Aff. ¶ 3.) Mad Brewer refers to him as the "assistant manager" to Graber. (Eric Brewer Aff. ¶ 22.) The EEOC charge states that there were two assistant managers when Graber was general manager and that Graber was replaced by the male assistant manager. (Def.'s Exh. to Br. in Supp. of Summ. J. 9, DE # 20-5.) Accordingly, the court will refer to Jones as the assistant manager, and notes that his duties pertained mostly to the kitchen.

Brewer Aff. ¶ 23.) Jones' annual salary was $27,000 per year. (*Id.*) Jones was terminated for sub-standard performance several months after he was hired. (*Id.* ¶ 25.) Graber does not dispute these facts. Graber does not dispute any of the facts in this section.

C.    *Jeff Neels*

According to Graber, Jeff Neels ("Neels") was a partner in Mad Brewer. (Graber Aff. ¶ 11.) Mad Brewer refutes this assertion but does not clarify Neels' role. Graber attests that Jones always complained to Neels and "everyone else had to suffer." (*Id.* ¶ 9.) She states that Jones "wouldn't work the hours that was expected from the managers and Jeff - would always make allowances or adjustments for him which none of the other managers were entitled to." (*Id.*) Graber claims that Neels and Stucky "have always gone to Brett around me and never to me on issues that were my responsibility." (*Id.* ¶ 11.) Graber states that she called Neels once about compensation for employees on New Year's Eve, and Neels responded by calling Jones to discuss the issue instead. (*Id.* ¶ 14.) She states that she asked Neels not to do that because Jones "does what he wants, when he wants, and does not listen to any one." (*Id.*) She states that Neels agreed, but then did not stop. (*Id.*) She talked to Eric Brewer about the situation and he told her to bide her time and Neels and Jones would be gone. (*Id.*)

Graber states in her affidavit that the night before she was terminated, she asked Neels what he thought her strong and weak points were and how she could improve her job performance. (Graber Aff. ¶ 14.) She states that his response was only that he had not worked with her because he was focused on Jones. (*Id.*)

*D.*     *Brett Jones*

Brett Jones was an assistant manager when Graber was the general manager at Mad Brewer. (Graber Aff. ¶ 3.) Although neither party explains the chain of command at Mad Brewer's, it appears from evidence produced by both parties that Jones officially reported to Graber when he was assistant manager. Graber states that Jones was very argumentative and had no management experience. (*Id.* ¶¶ 8-9.) She states that Jones caused many problems and that she realizes in retrospect that she was unknowingly training him as her replacement. (*Id.* ¶ 9.) She states that Jones received special treatment such as time off, payroll checks cut before payday, and other "allowances and adjustments that other managers weren't entitled to." (*Id.*) She states "[t]hat treatment was extended to him alone. where dealt with or handled."[5] (*Id.*) She attests that she received numerous phone calls from Jones every day that showed that he lacked the skills to run a restaurant. (*Id.*) She also states that she informed Eric Brewer whenever there was a problem with staff, particularly with Jones. (Graber Aff. ¶ 11.) Specifically, she states that she always told Eric Brewer about Jones' issues with incompetent ordering, bad work performance, tardiness, and unavailability. (*Id.* ¶ 9.)

After Graber was terminated, Mad Brewer promoted Jones into the position of general manager. (Eric Brewer Aff. ¶ 23.) Jones' annual salary was $27,000 per year. Mad Brewer alleges that once Jones was general manager, the restaurant no longer had

---

[5] Some of the language in Graber's affidavit is unclear or incomplete. The court has not attempted to fix some of these apparent errors for fear that it would change Graber's intended meaning in the process.

problems with payroll submissions, checkbook maintenance, reconciliation of sales and cash receipts, inventory records, and payment of supplies as it had when Graber was general manager. (*Id.* ¶ 24.) Mad Brewer reports that Jones' performance was deficient in other areas, leading to his termination several months later. (*Id.* ¶ 25.) Graber does not dispute these facts.

E.    *Graber's performance as general manager*

i.    Training Period

Eric Brewer claims that Graber's performance during her training period was "not stellar." (Eric Brewer Aff. ¶ 13.) He attests that she failed to timely report to work on several occasions, left early at other times, and was criticized by the manager of the Mad Anthony's Warsaw location, who appears to have been Blaine Stucky, for sitting and chatting with waiters when her services were needed elsewhere. (*Id.*) Graber contests this version of the occurrence in Warsaw. She states that because some of the new servers had no experience, they were practicing serving each other. (Graber Aff. ¶ 16.) There were "not enough people," so she sat with the new servers. (*Id.*) Stucky approached Graber and asked her why she was sitting down. (*Id.*) Before she could answer, Stucky told her that she did not have what it took to be a general manager and that she did not know what she was doing. (*Id.*) When she remained calm, he told her that showed him that she did not get it. (*Id.*) Graber walked away, shaking. (*Id.*) At some point, perhaps during the same confrontation, Stucky told Graber that she was "not his pick." (*Id.* ¶ 13.)

ii.    Beginning of Mad Brewer's Operation

According to Mad Brewer, Graber performed unsatisfactorily once the restaurant was opened. Mad Brewer contends that within the first three weeks of the restaurant's operation, Graber exhibited five deficiencies in her performance as general manager. (Eric Brewer Aff. ¶ 15.) To support its account of Graber's performance, Mad Brewer cites to proposed testimony in the affidavits of Eric Brewer and Matthew Faley ("Faley"), a certified public accountant who did accounting, payroll, and general ledger reconciliation for Mad Anthony's. (Matthew Faley Aff ¶¶ 4, 7, Def.'s Exh. to Br. in Supp. of Summ. J., DE # 20-3.) It also points to Mad Brewer's business records including checkbook records, inventory records, the general ledger, and weekly sales/comp sheets. Graber, relying on her own proposed testimony as set forth in her affidavit, has presented factual disputes for some, but not all, of these claimed deficiencies.

a.    Payroll

First, Mad Brewer claims that Graber submitted inaccurate and untimely payroll information to Mad Brewer's payroll service, causing some employees to be underpaid. (Eric Brewer Aff. ¶ 15; Faley Aff ¶¶ 10, 11.) In order to remedy inaccurate payroll submissions, Faley needed to take the time to handwrite employee paychecks. (*Id.* ¶ 10.) Graber's late submission of payroll information forced Faley to rearrange the payroll schedule. (*Id.* ¶ 11.)

Mad Brewer claims that Graber created another payroll problem by failing to timely submit recently hired employee information to Faley. (Faley Aff. ¶ 12.)

Consequently, Faley had to spend "numerous hours determining which new employees had not been entered into the payroll service and then separately process[ing] the new hire payroll." (*Id.* ¶ 12.) Faley's proposed testimony is that Graber's payroll deficiencies continued throughout her time as general manager. (*Id.* ¶ 14.)

Graber gives her own account of problems with the payroll, but it is not clear which claimed deficiency she is addressing. Her account does not directly contradict any of the facts presented by Mad Brewer. Graber states that Faley set protocols in place from the beginning for handling trainee's payroll. (Graber Aff. ¶ 4.) According to Graber, during orientation, she instructed trainees to sign in at the hostess station during every day of training. (Graber Aff. ¶ 2.) This was Faley's system for logging the trainees' hours before they were entered into the computer system. (*Id.* ¶ 2.) When she retrieved the sign-in information and sent it to Faley, she discovered that some of the kitchen staff information was missing. (*Id.* ¶ 3.) She then informed Jones that some of his "kitchen staff time was missing from the spreadsheet at the hostess stand." (*Id.* ¶ 3.) Jones informed her that he "took it upon himself to do his own system that was outside the parameters of what was instructed to all trainees from the beginning." (*Id.*) Graber told Jones that she needed all his documentation on his staff training hours to send to Faley. (*Id.* ¶ 4.) Jones told her not to worry and he would take care of the issue. (*Id.*)

Four days later, Faley called Graber and told her that he did not have the staff training hours. (Graber Aff. ¶ 5.) Graber was surprised that Jones had not addressed the issue. (*Id.*) Faley told her to send what she had and then he would handwrite checks.

(*Id.* ¶ 6.) Graber then states that she and Faley were in an office, perhaps at Mad Anthony's Warsaw location, and Jones came in with his time slips. (*Id.* ¶ 7.) She states that Faley asked Jones why he did not follow protocol and Jones answered that he "chose to do his own thing." (*Id.* ¶ 8.) Faley scolded Jones for not following the protocol and for causing much time to be spent documenting trainee payroll and handwriting checks. (*Id.* ¶ 8.) Jones responded, "what's the big deal, it's done and over it." (*Id.*) Payroll was late and employees could not be paid because of Jones' "lack of following directions and lack of management responsibility." (*Id.*) Graber states that it "took three days to clean up his mess." (*Id.*)

<b><u>b.</u></b>      <u>Vendor invoices</u>

Second, Mad Brewer has produced pieces of discovery showing that Graber failed to submit vendors invoices for payment. (Eric Brewer Aff. ¶ 19; Faley Aff. ¶ 20.) According to Mad Brewer protocol, Graber, as the general manager, was to submit all vendor invoices to Faley for payment. (Faley Aff. ¶ 20.) Graber did not submit invoices to Faley in a timely manner and he became aware of invoices only after they were past due. (*Id.* ¶ 20.) Faley had to work with the vendors to resolve the payment issues and the late payments negatively affected Mad Brewer's credit with vendors. (*Id.*) Graber does not dispute these facts.

<b><u>c.</u></b>      <u>Checkbook records</u>

A third factor that Mad Brewer points to for its decision to terminate Graber was her failure to maintain accurate and thorough checkbook records for Mad Brewer. (Eric Brewer Aff. ¶ 16.) Mad Brewer has submitted copies of the check register records showing that Graber failed to record check amounts, dates, and payee information. (*Id.*; Exh. A to Def.'s Br. in Supp. of Mot. for Summ. J. 1-3, DE # 20-4.) Pages of the check registry, covering a time period from November 25, 2008 to December 12, 2008, including eighteen different checks, show that no information was recorded for four of the checks and the amount paid was not recorded for two more checks. (*Id.*) Mad Brewer claims that these omissions made reconciliation of the checkbook difficult and time-consuming. (Eric Brewer Aff. ¶ 16.) Graber has not presented anything to put these facts into dispute.

### d.    Food inventory records

Fourth, Mad Brewer states that it terminated Graber for maintaining inaccurate food inventory records. (Eric Brewer Aff ¶ 18.) Mad Brewer has attached a copy of the weekly food inventory for the week of December 28, 2008. (Def.'s Exh. B. to Def.'s Br. in Supp. of Mot. for Summ. J. 4-9, DE # 20-4.) The inventory shows negative usage amounts of food inventory, no deliveries of food inventory, and negative costs of food inventory. (Eric Brewer Aff. ¶ 18.) The inventory record for December 28, 2008, shows that no food at all was purchased that week. (Def.'s Exh. B.) The failure to record the purchase of any food resulted in negative cost and negative usage totals. (*Id.*)

### e.    Reconciliation of cash drawer with cash register receipts

Fifth, Mad Brewer states that Graber performed below its expectations in relation to reconciliation of the cash drawer with the cash register receipts. (Eric Brewer Aff. ¶¶ 9, 17; Faley Aff. ¶ 15.) Eric Brewer states that the cash on hand at Mad Brewer at the end of a business day was often less than the cash receipts showed should be there and the amount deposited to the bank was lower than what Graber reported as cash on hand. (Eric Brewer Aff. ¶ 17.)

Faley states that as part of Graber's duties as general manager she reconciled the cash and receipts at the conclusion of each day. (Faley Aff. ¶ 15.) When Faley prepared the general ledger, he independently calculated Mad Brewer's weekly cash and receipts to determine whether the cash drawer was over or short. (*Id.*) During the first three weeks of Mad Brewer's operation, Graber reported cash shortages totaling $436.56. (*Id.* ¶ 16; Def.'s Exh. C, D, and G to Def.'s Br., DE # 20-4, DE # 20-5.) Faley calculated the total cash shortage for those three weeks to be $756.83. (Def.'s Exh. E, F, and H to Def.'s Br., DE # 20-4, DE # 20-5; Faley Aff. ¶ 17.) Faley stated in his affidavit that "[t]he shortages reported by the Plaintiff and the shortages calculated on the general ledger were significant even considering that it was the Defendant's initial weeks of operation." (Faley Aff. ¶ 18.)

Graber does not dispute that there were issues with reconciling the cash drawer at the end of each day. (Graber Aff. ¶ 12.) She states in her affidavit that: "Since we opened for business the daily cash drawer and the end of business day total never matched up," and that she informed Eric Brewer and Faley of these problems from the

14

beginning. (*Id.*) She states that when closing "the managers never balanced at the end of the night and would spend hours trying to balance the drawers." (*Id.*) According to Graber, she closed one time during her employment and was able to balance at the end of the day. (*Id.*) However, she does not dispute Eric Brewer's statement that as general manager she was responsible for daily calculation and reconciliation of the cash and charge receipts. (Eric Brewer Aff. ¶ 9.)

Graber states that Faley told her that shortages were to be expected because of the high number of transactions and new employees. (Graber Aff. ¶ 12.) He told her that all Mad Anthony's businesses had problems in this area, and it was to be expected. (*Id.*) However, she acknowledges that Faley said that Mad Brewer's numbers were the lowest of all three Mad Anthony's locations. (*Id.*)

Graber does not contest that the issues with the cash drawer were almost completely resolved in the first week following her termination. (Faley Aff. ¶ 19.) The new general manager and Faley both calculated a total overage of $17.31 for that week. (*Id.*; Exhs. I and J to Def.'s Br. 4-5, DE # 20-5.)

F.    *Review of Graber's performance*

The parties dispute whether Graber received any negative feedback or performance reviews while working for Mad Brewer from Eric Brewer. Graber states that "[o]ther managers were given a review and [she] was not." (Graber Aff. ¶ 10.) She states that she was supposed to receive a review on the day she was fired, but she never did. (*Id.* ¶ 14) She also states that "[d]uring the course of [her] employment [her]

performance was never questioned." (*Id.* ¶ 10) She states: "I was never told that there were any issues with my performance from the man who hired me, Eric Brewer." (*Id.* ¶ 11.)

In contrast, Mad Brewer presents Eric Brewer's proposed testimony that Graber's five deficiencies, as outlined above, all "became apparent during the first three weeks of opening the Defendant's Elkhart restaurant, and I informed the Plaintiff of these deficiencies on several occasions." (Eric Brewer Aff. ¶ 20.)

Further, Mad Brewer points to Faley's affidavit for his proposed testimony of discussing Graber's performance with her. (Def.'s Reply 8.) Faley states:

> On numerous occasions, I spoke with the Plaintiff regarding her inaccurate and untimely submission of payroll information. During these discussions I emphasized to the Plaintiff the impact that her deficiencies had upon processing of payroll. Additionally I requested that the Plaintiff improve her performance with respect to payroll.

(Faley Aff. ¶ 13.) He also states that he had multiple discussions with Eric Brewer regarding Graber's deficiencies with payroll, reconciliation, and submission of invoices and that during these discussions, he told Eric Brewer that he had specifically asked Graber to remedy these problems. (*Id.* ¶ 22.)

Graber has not presented any argument or pointed to any pieces of discovery to dispute Faley's account of her interaction with him. As stated above, Graber's accounts of both the payroll issues and the cash reconciliation issues indicate that Faley spoke to her about these problems.

G.    *Graber's termination*

Eric Brewer states that he made the decision to terminate Graber in early January, 2009 because of the five deficiencies outlined above. (Eric Brewer Aff. ¶ 22.) He attests: "The Plaintiff's gender did not factor in any manner into my decision to terminate her employment." (*Id.*)

### H.    *Maria*

Graber refers intermittently to a person named "Maria" who worked at Mad Brewer along with Graber and Jones.[6] Graber states that Eric Brewer hired Maria. (Graber Aff. ¶ 11.) She states that she and Maria "were both advised and belittled by the other partners Jeff and Blaine that we could be replaced by other staff for less money." (*Id.*) She also states that "Maria was involve in the mix and watched Brett circumvent the system with Jeff." (*Id.* ¶ 17.) Graber also attests that Jones was always "trying to pass his responsibilities and obligations off on [her] and Maria." (*Id.* ¶ 13.)

### H.    *Comment from Eric Brewer's wife*

Graber states that Eric Brewer's wife told her: "It is a boys club and if you are not a boy you will not get, why do you think all of the wives stay out and are not involved." (Graber Aff. ¶ 18.)

### I.    *Any complaints of gender discrimination*

Mad Brewer states that plaintiff did not claim that she had been unlawfully discriminated against at any point during her employment. (Eric Brewer Aff. ¶ 28.) Eric

---

[6] The EEOC charge states that when Graber was general manager, Mad Brewer had two assistant managers, one male and one female. (Def.'s Exh. L 8-9, DE # 20-5.) It appears likely that Maria was the female assistant manager.

Brewer states that Mad Brewer's employee handbook outlined a procedure by which employees could report a claim of illegal discrimination. (*Id.* ¶ 26.) He states that Graber knew of and received the employee Handbook. (*Id.* ¶ 27.) Graber responds that, following the policy, she did complain to Eric Brewer. (Pl.'s Resp. 12.) To this end, it appears that Graber offers her proposed testimony of several instances in which she complained about Jones' performance. (*Id.*; Graber Aff. ¶ 9.)

Her testimony about these instances would be:

> I always informed Eric Brewer my boss what going on with Brett and none of the issues, incompetent ordering, bad work performance, always being late, and unavailability to staff, because no one knew where he was.

(*Id.* ¶ 9.)

> Eric was always informed when there were any issues with staff; Brett's been a constant problem because of lack of work ethic, no responsibility and basic incompetence.

(*Id.* ¶ 11.)

> Brewer advised me when I brought incompetence issues to him over Jones, to bide my time, find some other key people and then you can replace hi. I have too much money invested in Jones to let him go now.

(*Id.*)

> I told Eric that he is making a monster and you are setting him up to where no one can work with him. It was very obvious that there was collusion going on between Jeff Neals and Brett Jones. I believe that this was arranged from the beginning.

(*Id.* ¶ 15.)

Graber also states that she told Eric Brewer when Neels called Jones about an employee vacation issue instead of contacting her directly. (Graber Aff. ¶ 14.) She also states that she informed Eric Brewer about the instance in which Stucky yelled at her. (*Id.* ¶ 16.) She states that Eric Brewer told her "bind your time they will not be here for much longer." (*Id.*)

J.    *EEOC charge*

Graber went to the EEOC with her charge of discrimination on January 12, 2009. (Def.'s Exh. L 8-9, DE # 20-5.) The EEOC intake form states that Graber reported that Eric Brewer would not give Graber an explanation for her termination. (*Id.* at 9.) It stated that when Graber was general manager, Mad Brewer had two assistant managers, one male and one female. (*Id.*) It states that the male assistant manager replaced Graber. (*Id.*) The EEOC charge states:

> [Graber] stated that Mr. Brewer was complaining about his finances prior to her termination. [Graber] believes that Mr. Brewer discharged her because he felt that he was paying her too much money.
>
> [Graber] did not have any evidence to offer in support of her belief that Mr. Brewer discharged her due to sex. . . . [Graber] did not have any additional evidence.

(*Id.*)

K.    *The parties' arguments*

In her complaint, Graber does not list specific counts, but she has included language that indicates possible claims of disparate treatment based on gender for her termination, hostile work environment, and intentional infliction of emotional distress.

(Pl.'s Compl. ¶¶ 6, 9, 11, 12, 13, 14.) However, the parties' briefing focuses only on a claim for disparate treatment based on gender for her termination.

Mad Brewer has moved for summary judgment stating that Graber does not have a claim for gender discrimination in violation of Title VII for her termination. (Def.'s Br. 10.) First, it argues that Graber has no direct evidence of discriminatory intent. (*Id.* at 12.) In support of its argument, it points to the EEOC's record to show that Graber admitted that she did not have direct or circumstantial evidence of discrimination. (*Id.*) Second, it argues that she cannot establish gender discrimination using the burden-shifting method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). (*Id.* at 13.) Mad Brewer argues that Graber cannot make a *prima facie* case of discrimination because she cannot prove that she met Mad Brewer's legitimate performance expectations and because she cannot prove that Mad Brewer extended more favorable treatment to similarly situated employees outside of her protected class. (*Id.* at 13, 16.)

In response, plaintiff argues that within her own affidavit she has direct evidence of discrimination in the form of evidence of suspicious timing, ambiguous oral statements, and comments directed towards other members of the protected group. (Pl.'s Resp. at 10.) In an apparent attempt to show this type of evidence, she emphasizes the comments made by Stucky and Neels, the better treatment received by Jones, including the instance in which Jones did not follow the protocol for new hires, and evidence that the reason Mad Brewer gave for her termination was pretextual.

(*Id.* at 10-11.) Graber also points to the comments by Eric Brewer's wife and then states "[a]lthough direct evidence of discrimination can be very powerful, courts often give little weight to discriminatory remarks made by persons other than decision makers [or] 'stray' remarks not pertaining directly to plaintiffs." (*Id.* at 14-15.)

Plaintiff's argument as to her ability to prove discrimination under the indirect or burden-shifting method is somewhat difficult to follow. (*See* Pl.'s Resp.11-15.) Her briefing on this point intersperses statements of Seventh Circuit law on the indirect method with unquoted excerpts from Graber's affidavit without discussing how the two should be connected. In support of both her arguments that she was meeting Mad Brewer's performance expectations to establish a *prima facie* case and that its proffered reason for terminating her was pretextual, Graber points out that she never received a written reprimand or negative review. (*Id.* at 12-13.) Additionally, to show pretext Graber points again to the entitlements given to Jones, the verbal abuse from Neels and Stucky, the comments made by Eric Brewer's wife, and her assertion that she was "used for her knowledge and expertise to getting a business off the ground and was replaced by an inexperienced male for less money." (*Id.* at 14.)

Further Graber argues that she did complain to Eric Brewer as required by company policy. (*Id.* at 12.) She states that she complained to him about Jones' poor performance and that special treatment was given to Jones. (*Id.*) Graber appears to offer this evidence to dispute Mad Brewer's assertion that Graber did not complain about

gender discrimination. Otherwise, Graber has not explained how evidence of her complaints about Jones helps support a claim of gender discrimination.

In reply, Mad Brewer argues, as mentioned above, that Graber has not placed any material facts into dispute because she did not follow the procedure to do so as outlined in RULE 56.1. It argues further that Graber cannot point to any evidence of direct discrimination. (Def.'s Reply 9.) It contends that Graber relies on her interactions with Stucky and Neels as direct evidence, but that these men were not co-owners of Mad Brewer and all employment decisions were made by Eric Brewer. (*Id.* at 9-10.)

Mad Brewer argues that Graber cannot establish a *prima facie* case of gender discrimination because she did not address three of the deficiencies that it cited as the reasons for her termination. (*Id.* at 11.) Further, it argues that Graber has not established that any similarly situated employees were treated more favorably than she. (*Id.* at 12.) It points out that to make this showing Graber relies on Jones' performance and treatment as assistant manager and that the standards for this position and general manager were different. (*Id.* at 12.) It contends that both male general managers were also terminated and both were paid less than Graber. (*Id.*)

## II.     STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment "bears the initial

responsibility of informing the district court of the basis for its motion, and identifying"

those materials listed in RULE 56(c) which "demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmovant may not rest upon

mere allegations. Instead, "[t]o successfully oppose a motion for summary judgment,

the nonmoving party must come forward with specific facts demonstrating that there is

a genuine issue for trial." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677

(7th Cir. 2008). "It is not the duty of the court to scour the record in search of evidence

to defeat a motion for summary judgment; rather, the nonmoving party bears the

responsibility of identifying the evidence upon which he relies." *Harney v. Speedway

SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). Furthermore, when evaluating a

motion for summary judgment, the court views the record and makes all reasonable

inferences in a light most favorable to the nonmovant. *Popovits v. Circuit City Stores, Inc.*,

185 F.3d 726, 731 (7th Cir. 1999). If the non-moving party cannot establish an essential

element of its claim, RULE 56(c) requires entry of summary judgment for that claim.

*Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23).

## III.   ANALYSIS

The only claim that Graber defends from summary judgment is her claim for

disparate treatment based on gender in violation of Title VII for her termination. The

court will briefly address other possible claims that Graber may have plead in her

complaint. In her complaint Graber makes some allegations of claims of hostile work

environment based on gender and intentional infliction of emotional distress. In response, Mad Brewer filed a motion for summary judgment, not for partial summary judgment. Mad Brewer's motion focuses on its argument that Graber does not have evidence to support a finding that Graber was terminated because of gender discrimination. Mad Brewer does not specifically address any other claims that Graber might have. However, in its motion, Mad Brewer states that "the Defendant requests that the Court enter summary judgment in its favor on the Plaintiff's complaint." (Def.'s Mot. for Summ. J. 2.) This makes it clear that Mad Brewer is seeking summary judgment on Graber's entire complaint.

In her brief in opposition to the motion for summary judgment, Graber does not raise or even mention any other claim besides disparate treatment based on gender for her termination. She has not produced evidence to support claims of hostile work environment or intentional infliction of emotional distress. By failing to raise these claims in her opposition to summary judgment, Graber has abandoned these claims. *Ledet v. Fleetwood Enters., Inc.*, 245 F.3d 791, at *3-*5 (5th Cir. Dec. 22, 2000) (unpublished) (finding that even though the defendant did not ask for summary judgment on a specific claim and the plaintiff plead parts of that claim in the complaint, the plaintiff waived that claim by not raising any legal or factual issue related to it in the opposition to summary judgment); *Grenier v. Cynamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995); *Hargrave v. Fibreboard Co.*, 710 F.2d 1154, 1163-64 (5th Cir. 1983) (holding that the plaintiff abandoned its alternative theories of recovery when its opposition to

24

summary judgment only raised facts and issues related to the one theory of recovery addressed in the defendant's motion for summary judgment).

In any case, the court notes that Graber has not presented evidence to support claims of intentional infliction of emotion distress or hostile work environment. Graber's complaint only recites the elements of a claim of intentional infliction of emotion distress and does not plead any facts to underlie that claim. *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) (stating that to survive a motion to dismiss, a plaintiff cannot just "give a threadbare recitation of the elements of a claim without factual support"). So far, Graber has not presented any evidence that Mad Brewer subjected Graber to any extreme and outrageous conduct that went "beyond all possible bounds of decency" - the type of conduct "regarded as atrocious and utterly intolerable in a civilized society." *Lindsey v. DeGroot,* 898 N.E.2d 1251, 1264-65 (Ind. Ct. App. 2009). Similarly, Graber has not plead facts or presented evidence that would show that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Thus, Graber has not demonstrated that she has triable issues for any claims beyond her claim for discrimination based on her termination.

Returning focus to the claim of disparate treatment based on gender for Graber's termination, Title VII prevents an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Graber can attempt to support her claim that her termination was a result of gender discrimination in one of two ways: either by proffering direct or circumstantial evidence that racial discrimination motivated the employment decision (known as the direct method), or by relying on the indirect, burden-shifting method outlined in *McDonnell Douglas, Corp. v. Green*, 411 U.S. 792 (1973); *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 783 (7th Cir. 2007) (citing *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736-37 (7th Cir. 2006)).

A.      *Direct method*

Graber can survive summary judgment under the direct method by demonstrating "triable issues as to whether discrimination motivated the adverse employment action" with either direct or circumstantial evidence. *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)). Direct evidence is evidence, such as an admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus, that allows the trier of fact to find discrimination without relying on inference or presumption. *Nichols,* 510 F.3d at 781; *Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 272 (7th Cir. 2004). Circumstantial evidence, more commonly relied upon, allows the trier of fact to find discrimination through inference. *Nichols,* 510 F.3d at 781. The three categories of circumstantial evidence, that can be used together to show a "convincing mosaic" of discrimination are:

> 1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; 2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and 3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Darchak*, 580 F.3d at 631 (citing *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007)); *Troupe v. May Dep't Stores, Inc.*, 20 F.3d 734, 736 (7th Cir. 1994)). The third category involves the same evidence as that used to show pretext under the indirect method. *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

Graber cannot prove discrimination by the direct method because none of the evidence presented by Graber is the type that "reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). Graber's evidence is insufficient because it does not show that the decision maker, Eric Brewer, acted with discrimination, much of it does not fit into the three categories of circumstantial evidence that can prove discrimination, and she is not able to prove pretext as discussed below.

To succeed under the direct method, Graber must present direct or circumstantial evidence that "the decisionmaker" acted for a prohibited reason. *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003). Graber has not disputed that Eric Brewer was her supervisor and the person who decided to terminate her. Eric Brewer would testify at trial that Graber's gender did not factor into his decision to terminate

her. (Eric Brewer Aff. ¶ 22.) Graber has not pointed to any statements from Eric Brewer that could be either direct or circumstantial proof of discrimination. She seems to try to offer evidence that Eric Brewer's actions could fit into the second and third categories of circumstantial evidence.

For the second category, Graber points to better treatment received by Jones. While this type of evidence need not be rigorously statistical, it needs to point to systemically better treatment of non-protected class members. However, Graber attests that the more favorable treatment was "extended to [Jones] alone, not to male employees generally. (Graber ¶ 9.) Therefore, she cannot show systemically better treatment of people outside her class. Further, Graber's only evidence that Jones was treated better are her own conclusory statements to that effect, and this is insufficient circumstantial evidence of discrimination. *Nagle*, 554 F.3d 1106.

Here and generally, Graber's battle against summary judgment is plagued by her continued and exclusive reliance on her own testimony which is frequently not based on personal knowledge. *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995) ("Evidence required to contradict the employer's evidence is rarely within the competence of the plaintiff to give, because of the rule that a witness (other than an expert witness) is not allowed to testify to matters outside his personal knowledge, . . . as well as because of other limitations on the admissibility of evidence, such as the hearsay rule.") (internal citations omitted); *Lac Du Flambeau*, 991 F.2d at 1259.

Graber attempts to present the type of evidence in the third category of circumstantial evidence - that Eric Brewer terminated her even though she was performing well. As explained in the court's discussion of the indirect method, there is no evidence from which a jury could find that Graber was performing up to her employer's legitimate expectations or that Mad Brewer's stated reasons for firing her were pretextual.

Graber's primary efforts to show discrimination focus on actions and statements attributed to Stucky and Neels. Again the focus of this analysis is on whether the decision maker acted with discriminatory intent. Stucky and Neels' roles in Mad Brewer are not clear. Graber refers to them as either co-owners or partners, but she provides no basis for this statement. Graber has not provided any evidence that Stucky or Neels were the true decision makers because Eric Brewer acted as their "'cat's paw' and rubber-stamped his recommendation." *Id.* Importantly, Graber has not presented evidence that Stucky or Neels influenced Eric Brewer's employment decision. *Schandelmeier-Bartels v. Chi. Park Dist.*, 2011 WL 383021, at *4-6, *8 (7th Cir. Feb. 8, 2011) (recognizing that the standard of proof needed for the cat's paw theory is an open question of law, stating that Title VII weighs against too stringent a standard of proof for this theory, and determining that "[u]nder the cat's paw theory, the appropriate inquiry is whether the biased" non-decisionmaker had "influence over the decision to" take the employment action); *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004). In fact, Graber presented evidence that she was hired even though Stucky stated that she

"wasn't his pick." The isolated comments of a non-decision makers are stray remarks that cannot be direct evidence of discrimination. *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 917 (7th Cir. 2007) ("In and of itself, whether other employees speak ill or spread rumor about one is not a very important aspect of one's employment, so long as such behavior is not severe or pervasive.")

Further, Graber has not shown how Stucky's or Neels' comments were connected to gender. This point is illuminated by Seventh Circuit's discussion in *Gorence v. Eagle Food Ctrs., Inc.* about the types of comments that can support a finding of discrimination under the direct method. 242 F.3d 759, 762 (7th Cir. 2001). The court states that comments such as "I fired Judy because she was an old woman," while rare, would be direct evidence of discrimination. *Id.* Comments such as "Old women are hard to deal with," without more do not. *Id.* The Seventh Circuit stated that typically, the evidence that a court deals with falls somewhere between these statements. *Id.* The evidence that Graber presents do not fall anywhere in between these statements but rather are weaker pieces of evidence than the later comment. Stucky's comments that Graber did not have what it took to run a restaurant, did not know what she was doing and was not his pick (Graber Aff. ¶¶ 13, 16.), may have been harshly delivered and embarrassing to receive. But there is nothing that links these comments to gender discrimination. *Cf. Visser v. Packer Eng'g Assocs. Inc.*, 924 F.2d 655, 657 (7th Cir. 1991) (stating that evidence showing an employer is a bad man is irrelevant if it does not indicate discriminatory motive.) Further, the incident happened months before Graber was fired. If the court allowed

these comments to be proof of gender discrimination, no employee would ever be allowed to say anything critical or unpleasant to another employee without subjecting the employer to a Title VII suit.

Neels' act of calling Jones instead of Graber is also not proof of gender discrimination. Evidence that an action was taken, without more, often cannot be used to show the motivation for that action. *Steinhauer v. DeGolier*, 359 F.3d 481, 485 (7th Cir. 2004) (stating that the plaintiff's evidence that someone else was hired to make a presentation at workshop did not provide "evidence of motivation, much less evidence that [the plaintiff was terminated] because of his sex"). The Seventh Circuit has determined that evidence that an employer directed a question to a person outside of the plaintiff's class instead of to the plaintiff is at best evidence of the plaintiff's subjective belief that the employer was biased - a showing insufficient to create a genuine issue of material fact. *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989). Similarly, evidence that Neels returned Graber's call to Jones does not show why Neels took this action or that he did this because he was motivated by gender discrimination.

The evidence of Neels' response to Graber's question about her strong and weak points is also not evidence of discrimination. According to Graber, Neels declined to give an answer to this question, stating that he didn't know her work well enough because his focus was on Jones. Neels' comment does not show that he was involved in the decision to fire Graber or that he had any kind of bias against women. This incident cannot support a finding that Graber was terminated because of her gender.

Graber may be making an anemic attempt to show that another person within the protected class, Maria, was treated poorly at Mad Brewer because Maria was "in the mix" and was belittled by Stucky and Neels. (Graber Aff. ¶ 17.) Graber has not presented an affidavit from Maria or any specifics about Maria's role at Mad Brewer, anything that was said to Maria by any person, or anything that happened to Maria. Graber's vague references to Maria are not circumstantial evidence of discrimination.

The comment from Eric Brewer's wife that "It is a boys club and if you are not a boy, you will not get" (Graber Aff. ¶ 18) can also not establish discrimination. To begin, Graber may not even be able to offer this evidence at trial since it appears to be hearsay. What is more, as Graber points out in her response, "[a]lthough direct evidence of discrimination can be very powerful, courts often give little weight to discriminatory remarks made by persons other than decision makers [or] 'stray' remarks not pertaining directly to plaintiffs." (Pl.'s Resp. 14-15.) Indeed, in order for a stray remark to be direct proof of discrimination, it must be shown to have some connection to the employment decision. *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1403 (7th Cir. 1996). Graber has not presented any proof that Eric Brewer's wife was a decision maker or had influence over Eric Brewer's employment decision. Nor has she shown that Mrs. Brewer even had personal knowledge of any of the employment decisions or operations of Mad Brewer. In fact, Graber attests that Mrs. Brewer continued on to say that the "wives stay out and are not involved." (Graber Aff. ¶ 18.) Mrs. Brewer's comment is certainly a "stray remark" that is "insufficient to defeat summary judgment." *Adelman-Reyes v. Saint*

*Xavier Univ.*, 500 F.3d 662, 666-67 (7th Cir. 2007) (quoting *Sun*, 473 F.3d at 813).

     B.     *Indirect method*

Under the indirect method Graber must first build a *prima facie* case of gender discrimination by identifying evidence that establishes: (1) she belonged to a protected class; (2) she was meeting defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) defendant treated similarly situated individuals who were not in her protected class more favorably. *See McDonnell Douglas*, 411 U.S. 792, 802. In this case, the first and third elements exist - Graber is a woman and she was terminated; so the parties focus on the second and fourth elements.

Mad Brewer has identified five performance deficiencies to show that Graber was not meeting its legitimate expectations. Graber does not dispute that the general manager's duties encompassed all of the duties in which the deficiencies occurred - preparing and submitting payroll, overseeing Mad Brewer's day-to-day operations, handling vendor invoices, keeping financial records, managing and procuring inventory and supplies, and calculating and reconciling cash and charge receipts on a daily basis. (Eric Brewer Aff. ¶ 9.) Instead, Graber, relying on her own affidavit, argues that the evidence shows that she was meeting Mad Brewer's expectations because she was never given a negative performance review and had not received any negative write-ups. In her response, Graber asserts that her performance was not deficient in any of the areas identified by Mad Brewer. (Pl.'s Resp. 2.) However, of the five deficiencies, Graber does not specifically address or point to evidence to dispute three of them.

33

Graber does not state in her affidavit that her performance in any of the five areas was sufficient.[7] In fact, Graber admits that she was aware of problems with cash reconciliation and payroll.

Graber's failure to dispute her allegedly deficient performance makes her case analogous to *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177 (7th Cir. 1997), in which the Seventh Circuit held that the plaintiff did not show that he was meeting his employer's legitimate employment expectations. In *Coco*, the plaintiff did not present any evidence that he had satisfactorily performed his duties as maintenance supervisor. *Id.* at 1180. The Seventh Circuit stated:

> If your job is to document maintenance problems, arrange for their correction, and conduct fire drills, and you fail to do these things, you are not performing up to your employer's legitimate expectations, and that is the end of your case if *McDonnell Douglas* is all that you have to go on.

*Id.* Similarly, Graber has not presented any evidence that she kept proper inventory records, properly submitted vendor invoices, timely submitted payroll, correctly

_____

[7] Even if Graber had presented testimony that her work was of sufficient quality, this evidence would be unlikely to create an issue of material fact. In some cases an employee's testimony of the quality of her own work can be enough to meet the second prong of plaintiff's *prima facie* case, *Oates v. Discovery Zone*, 116 F.3d 1161, 1171-72 (7th Cir. 1997); *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 923 n.6 (7th Cir. 1988), but in many cases a plaintiff's self-serving appraisals are not enough to create a genuine issue of fact. *Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008) (citations omitted); *Nichols,* 510 F.3d at 784 ("We have repeatedly stated, however, that plaintiffs must offer more than mere self-serving appraisals.") This case belongs among the latter set of cases. Graber does not present any specifics about her satisfactory performance. She also admits that there were problems with cash reconciliation and payroll while she was general manager.

reconciled cash receipts and cash on hand, or recorded the necessary checkbook

information. Instead, she focuses on her failure to receive direct notice of these

deficiencies from Eric Brewer or a written evaluation and Jones' poor performance.

Towards that end, when an employer has provided specific examples of an employee's

deficient performance in critical areas, an employee cannot show that she was

performing satisfactorily by simply pointing to more serious errors by other employees

or by showing that she received favorable reviews. *See e.g., Bedynek-Stumm v. Glickman,*

234 F.3d 1272, at *2 (7th Cir. Oct. 24, 2000) (unpublished).

Further, Graber's evidence that she was never given a written evaluation or a

performance review from Eric Brewer cannot prove that she was meeting Mad Brewer's

legitimate employment expectations. In evaluating whether an employee has met an

employer's legitimate expectations, courts may consider whether the employee has

received written evaluations. *See e.g., Stenholt v. Centex Real Estate Corp.,* No. 95-C-2664,

1996 WL 529414, at* 5 (N.D. Ill. Sept. 13, 1996) (unpublished) (finding that it was

inconsequential that the plaintiff was not formally informed of his employer's

dissatisfaction with his performance when the plaintiff was verbally told that he needed

to improve his performance and that his supervisor did not give written evaluations to

any employees.)

But absence of written evaluations becomes less important when, as here, the

plaintiff cannot present evidence to refute the deficiencies. In *Coco*, the plaintiff

attempted to show that he was meeting his employer's legitimate expectations by

showing that it did not follow its own policy of progressive discipline in terminating his employment. 128 F.3d at 1180. The Seventh Circuit determined that this evidence would only be relevant if the plaintiff could reach the issue of pretext by demonstrating that he had performed the duties required by his job, a showing he had not made. *Id.* Graber argues that Mad Brewer states that her performance was deficient starting before the restaurant opened, and continuing through her five some months of employment, but it "*never* noted in *writing* for her personnel files any of these failures." (Pl.'s Resp. 2.) However, like in *Coco*, this argument is better addressed towards pretext, as will be discussed later, and is not relevant since Graber cannot prove that she was meeting Mad Brewer's legitimate expectations.

Graber also cannot establish a *prima facie* case because she cannot show that similarly situated individuals outside of her class were treated more favorably. Graber does not respond to Mad Brewer's argument that she cannot prove this element because two male general managers were fired for poor performance. Instead, Graber argues that Jones was treated better than her when he was assistant manager because he was extended on the job allowances, such as excused tardiness, extra time off, and payroll checks cut before payday, that were not offered to her.[8] (Graber Aff. ¶ 9.)

_____

[8] The court notes that the Seventh Circuit accepted similar evidence of informal job advantages as evidence of better treatment. For example, in *Massey v. Blue Cross-Blue Shield of Ill.*, the African-American plaintiff presented evidence that a Caucasian woman in the same position as her with same seniority level, was helped by the supervisor whenever she needed it whereas the plaintiff was not. 226 F.3d 922, 926 (7th Cir. 2000). The court pointed to this as evidence that a similarly situated employee outside of the protected class received better treatment than the plaintiff. *Id.*

An initial problem is that the only evidence that Graber presents to show that Jones was treated more favorably is her own conclusory assertions. The Seventh Circuit has held that this type of evidence is not enough to establish a *prima facie* case and survive summary judgment. *Oest v. Ill. Dep't. of Corr.*, 240 F.3d 605, 614 (7th Cir. 2001) ("We previously have upheld the entry of summary judgment against a Title VII plaintiff who has presented only his own uncorroborated, conclusory statements that similarly situated co-workers were treated differently.") *See, e.g., Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir.1998); *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 446 (7th Cir. 1997).

Further, to satisfy this element of a *prima facie* case, Graber must produce evidence showing substantial similarity, though not complete identity, between herself and Jones. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). To evaluate substantial similarity, the court must look to a number of factors which vary depending upon the context of the case. *Id.* at 617-18. In this situation, relevant factors are whether the two employees had the same supervisor and were subject to the same standards. *Id.* A court should also consider the comparable experience, education, and qualifications of the two employees. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

In this case, Graber points only to treatment extended to Jones when he was assistant manager, not when he was general manager. Jones and Graber cannot be considered to be similarly situated when they held different positions and had different job responsibilities. *See e.g., Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751

37

(7th Cir. 2006). Mad Brewer states in its reply brief that its expectations for these two positions was different. (Def.'s Reply 12.) It would have helped this court if Mad Brewer had provided a piece of discovery material to support this assertion. However, it is clear that Graber and Jones held two different positions and that Jones was focused on the kitchen. (*See e.g.,* Graber Aff. ¶ 3.) Thus, viewed in the light most favorable to Graber, the evidence shows that she and Jones held two different jobs with different sets of responsibilities when Jones was assistant manager. *Cf. Patterson*, 281 F.3d at 680 (stating in the context of promotional decisions that "the supervisor's additional experience makes it next to impossible for a court to conclude that a subordinate is similarly situated to him"). Thus a person hired into the general manager position is not similarly situated to the person in the assistant manager position.

Even more, Graber does nothing to create a general issue of material fact as to the treatment extended to the two men in the general manager position before and after Graber. The undisputed evidence shows that Jones was paid $20,000 less than Graber and that both Jones and Tribble were terminated when their performance was deficient. (Eric Brewer Aff. ¶¶ 11, 12, 23, 25.) Therefore, she cannot prove that more favorable treatment was extended to any similarly situated people outside of her class. In sum, Graber cannot establish a *prima facie* case of discrimination because she has not produced evidence from which a factfinder could infer that she was meeting Mad Brewer's legitimate employment expectations or that a similarly situated employee outside of her class was treated more favorably.

Once a plaintiff establishes a *prima facie* case, the burden shifts back to the

defendant to articulate a legitimate, nondiscriminatory reason for the employee's

termination. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). If the

defendant has met this burden of production, the plaintiff has an opportunity to prove

by a preponderance of the evidence that the legitimate reason given by the employer is

not truthful, but rather a pretext for discrimination. *Id.*; *Williams,* 856 F.2d at 923. Since

Graber has not carried her initial *prima facie* burden, the court does not need to

determine whether Graber can establish pretext. However, the court will discuss

Graber's inability to prove pretext in order to stress that she cannot support her case

with either the indirect method or through circumstantial evidence under the direct

method. *Cf. Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 844

(7th Cir. 1996)

A plaintiff may demonstrate that an employer's explanation is pretextual directly

by showing that "a discriminatory reason more likely motivated" its employment action

or indirectly by showing that the employer's explanations are "unworthy of credence."

*Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009) (citing *Tex. Dep't of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 256 (1981)). Either way, in order to find that the employer

discriminated it is not enough for the factfinder to "to *dis* believe the employer; the

factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (quoting *St. Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 519 (1993)). However, a factfinder can "infer the ultimate fact of

discrimination from the falsity of the employer's explanation." *Id.* To show that the employer's reason is unworthy of credence, a plaintiff "must *specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills,* 83 F.3d at 845 (citing *Collier v. Budd Co., 66 F.3d 886, 893 (7th Cir.1995)) (emphasis in *Mills*). In this case, Graber cannot make either a direct or indirect showing that Mad Brewer's proffered reason for her termination was pretext for discrimination.

First, in order to prove pretext, Graber has to specifically refute Mad Brewer's proffered reasons for firing her. *Mills*, 83 F.3d at 846. As previously discussed, Graber has failed to do this - she does not dispute three of the five deficiencies Mad Brewer identifies as underlying its decision. For the two deficiencies that she does contest, Graber blames the problem on the staff she supervised. Because it is uncontested that supervision of personnel was part of Graber's job responsibilities and payroll and cash reconciliation were her duties (Eric Brewer Aff. ¶ 9), Mad Brewer can hold her responsible for her staff's failure to sufficiently perform these duties.

Second, Graber's subjective self-serving appraisals are simply not enough to create a genuine issue of fact on the issue of pretext because for this inquiry it is the belief of the decision maker, not of the employee, that is relevant. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir. 1998). Graber cannot avoid summary judgment by arguing that Mad Brewer's proffered account of her deficiencies was insufficient because, in her view, her performance was never questioned before her termination. What is relevant is the perception of the employer, not the view of the

employee. *Id.* at 398. Mad Brewer has submitted extensive proof of Graber's deficiencies with payroll, cash reconciliation, vendor invoices, and inventory records. (*See* Def.'s Exhs. A-J.) These duties were all part of the general manager's duties and are responsibilities that are central to the successful operation of a restaurant. Graber's testimony does not dispute most of these deficiencies, so she cannot show that Mad Brewer could not have honestly believed that she was failing to perform these duties.

Graber stresses that she never had an official performance review or any negative feedback from Eric Brewer, but this evidence is not sufficient to create a genuine issue of fact as to pretext. First, Graber admits that she received negative feedback from Stucky and notice of several of her accounting deficiencies from the Mad Anthony's accountant, Faley. (Graber Aff. ¶¶ 5, 12, 16.) These warnings put her on notice that her performance was not satisfactory. *See Adreani*, 154 F.3d at 397-98 (finding that there was no genuine issue about the plaintiff's performance deficiencies, even though he was not given written performance evaluations, because warnings from supervisors "put him on notice that his performance was not satisfactory"). Second, in some cases an employer's failure to follow its own policies for evaluation and termination can indicate pretext, *Coco*, 128 F.3d at 1180, but such is not the case here. Graber has not established that Mad Brewer had an official policy of written evaluations or performance reviews. She has just stated that other employees received performance reviews. (Graber Aff. ¶ 10.) Further, when an employer can point to unrefuted employment deficiencies, a plaintiff cannot create a genuine issue of fact as to pretext by

stating that he received positive performance reviews before termination. *See e.g.,*
*Bedynek-Stumm,* 234 F.3d at \*2. Thus it follows that Graber cannot create a genuine issue
of fact by simply arguing that she received no evaluation whatsoever.

Similarly, Graber appears to be attempting to show pretext by arguing that Jones
was promoted into the position of general manager even though he was inexperienced
and performed deficiently. However, without more, a plaintiff's subjective belief that
she is more qualified than another employee does not establish pretext. *See Johnson v.*
*Nordstrom, Inc.,* 260 F.3d 727, 733 (7th Cir. 2001). Also, as stated above, a plaintiff cannot
prove that he was meeting his employer's legitimate expectations, much less pretext, by
showing that his performance deficiencies were less problematic than those of
employees who were not terminated. *See e.g., Bedynek-Stumm,* 234 F.3d 1272 at \*2.

Third, fatal to Graber's case is that her primary argument that she was fired so
that Mad Brewer could "replace[ ] her with an inexperienced idiot for less money"
(Graber Aff. ¶ 17) does not show that Mad Brewer discriminated against her on the
basis of gender. The court is "concerned solely with whether the reason for which the
employer discharged the employee was discriminatory." *Adreani,* 154 F.3d at 398
(quoting *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir. 1997)).
When using the indirect method "[t]he precise question . . . is not whether the
employer's justification for the adverse action is a pretext, but whether it is 'a pretext for
the sort of discrimination prohibited by [Title VII].'" *Greene v. Potter,* 557 F.3d 765,
769 (7th Cir. 2009) (quoting *McDonnell Douglas,* 411 U.S. at 804). Here, even if a jury

42

believed Graber's reason for her termination, that Mad Brewer was using her to train Jones who would work cheaper, they could not find that she was fired because of her gender.

In *Reeves*, the Supreme Court stated that even if a plaintiff has established a *prima facie* case and presented evidence to reject the defendant's explanation, judgment as a matter of law for the employer is still appropriate if "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision." 530 U.S. at 148. In *Greene* the Seventh Circuit concluded that pursuant to *Reeves*, summary judgment is appropriate when a "a plaintiff is able to prove that the employer's stated reason is false, but in so doing, makes clear that the true reason was not illegal discrimination." 557 F.3d at 770. There the plaintiff claimed that she was discriminated against on the basis of gender because she did not receive her share of overtime shifts at the post office. *Id.* at 767. The post office stated that it gave the overtime shifts according to business needs. *Id.* at 770. The testimony that the plaintiff presented showed that two of the supervisor's friends, both male, were given most of the overtime shifts while other employees, both female and male, were overlooked. *Id.* at 771. The Seventh Circuit concluded that "Greene has disproved her intentional discrimination claim because her own evidence 'conclusively revealed some other, nondiscriminatory reason for the employer's decision.'" *Id.* (quoting *Reeves*, 530 U.S. at 148); s*ee also Hennessey v. Good Earth Tools, Inc.*, 126 F.3d 1107, 1109 (8th Cir. 1997) (stating that to survive a motion for summary judgment, the plaintiff must show that the employer's claimed reason was a

"pretext for *discrimination,* not for some other, legitimate motive"); *Rothmeier v. Inv. Advisers, Inc.,* 85 F.3d 1328, 1337-38 (8th Cir. 1996) (finding that a plaintiff who claimed termination due to age discrimination defeated his own case when, to prove that the employer's stated reason was false, he presented evidence that the true reason he was fired was that he had discovered SEC violations that his company was attempting to keep concealed).

In summarizing her facts, Graber states: "The facts will show the defendant hired Plaintiff Corry Graber to get its establishment up and going, using her expertise to train an unqualified male that was to be her replacement, then terminating her for trumped up reasons once it felt she was disposable." (Pl.'s Resp. 3.) If a jury believed Graber that she was fired because Mad Brewer wished to replace her with someone who was cheaper, her case would fit squarely into the category identified as appropriate for summary judgment by the Supreme Court in *Reeves*. From the facts she has presented, the best she can do is to defeat her own case.

Additionally, as the EEOC noted in its charge, there is another issue to consider in this case - the same actor inference. While courts should not place undue weight on this inference, it can be considered when the same person hires and terminates another person especially when these events happen close in time to each other. *Martino v. MCI Commc'ns Servs., Inc.,* 574 F.3d 447, 455 (7th Cir. 2009). This inference is based on the common-sense notion that someone who disliked or intended to discriminate against a person based on status would probably not initially hire that person. *Id.*; *Steinhauer,* 359

F.3d at 488 (finding that "it is unreasonable to infer that [plaintiff's supervisors] decided to terminate [plaintiff] based on his sex since they had just decided to hire him notwithstanding his sex"). Even without the same actor inference, Graber has not produced enough evidence to support a claim of gender discrimination. The same actor inference is not needed for Mad Brewer's summary judgment motion to avail; it is simply "one more thing stacked against" Graber. *Martino*, 574 F. 3d at 455.

In sum, Graber does not have any direct or circumstantial evidence that she was fired because of gender discrimination. Most of the evidence she presents are stray remarks from non-decision makers. None of the evidence she presents has any connection to gender even if the court searches for every possible ambiguity and weighs every inference in Graber's favor. Graber also cannot prevail under the indirect method because she cannot show that she was meeting Mad Brewer's legitimate expectations or that a similarly situated person outside of her class was treated more favorably. Even if she could make these two showings, she could not prove that the five deficiencies Mad Brewer points to for her termination were pretext since she has not even refuted three of them. In fact, if a jury believed Graber's version of the facts, they would find that she was terminated so that Mad Brewer could pay someone less to do her job - this would be contrary to a finding of gender discrimination. And finally, common sense weighs toward an inference that Eric Brewer, who hired Graber in July, would not fire her for being a woman six months later. Graber's complete failure to present any evidence that could support a claim of gender discrimination leads to the court's conclusion that she

would not have any type of fighting chance at trial, *Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990), making summary judgment appropriate on the claim that Graber was terminated because of gender discrimination.

## IV.     CONCLUSION

For the foregoing reasons, Mad Brewer's motion for summary judgment (Def.'s Mot. for Summ. J., DE # 53) is **GRANTED.** Because no claims remain against the defendant in this case, the clerk is directed to **ENTER FINAL JUDGMENT** in favor of defendant Mad Brewer, Inc. and against plaintiff Corry L. Graber, stating that Graber shall take nothing by way of her complaint.

**SO ORDERED.**

Date: February 24, 2011

 s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT